1  BRIAN J. STRETCH (CABN 163273)
   United States Attorney

2

3  DAVID R. CALLAWAY (CABN 121782)
   Chief, Criminal Division

4  TIMOTHY J. LUCEY (CABN 172332)
   Assistant United States Attorney

5

6      150 Almaden Blvd., Suite 900
       San Jose, California 95113

7      Telephone: (408) 535-5054
       FAX: (408) 535-5066

8      timothy.lucey@usdoj.gov

9  Attorneys for United States of America

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,              )   No. CR 13 - 0169 CRB
                                           )
15          Plaintiff,                     )   UNITED STATES' SENTENCING
                                           )   MEMORANDUM
16     v.                                  )
                                           )
17  FEDERICO R. BUENROSTRO, JR.,           )
       aka Fred Buenrostro,                )
18                                         )
            Defendant.                     )
19                                         )
                                           )
20                                         )
                                           )
21  _____  )

22

23

24

25

26

27

28

# TABLE OF CONTENTS

SUMMARY ..............................................................................................................................1

THE CRIMINAL CONDUCT ...............................................................................................2

    A.    The Conspirators ...................................................................................................2

        1.    Buenrostro ............................................................................................2

        2.    Villalobos and his Company ...............................................................2

    B.    The Victims ...........................................................................................................3

        1.    CalPERS ...............................................................................................3

        2.    Apollo Global Management ................................................................3

    C.    The Corrupt Relationship and Resulting Conspiracy ........................................3

    D.    Buenrostro and Villalobos Conspired to Defraud CalPERS and Apollo...........4

        1.    Apollo Formally Advised ARVCO of Investor Disclosure Requirement ...........................................................................................4

        2.    CalPERS Refused to Execute Letter for Fund VII .............................4

        3.    Villalobos Delayed until Buenrostro Signed the Fund VII Letter .......5

        4.    The Corruption Deepened When Buenrostro Accepted Cash from Villalobos ............................................................................................5

        5.    Villalobos Needed a Signed Form in Order to Be Paid .....................6

        6.    Fund VII Letter, Now Signed by Buenrostro, Is Mailed to Apollo ........7

        7.    With Apollo Paying, Villalobos Went Back to Buenrostro for More Signatures ..........................................................................................7

        8.    ARVCO Was Unable to Get a Disclosure Letter from UC Regents and Did Not Get Paid ..........................................................................8

        9.    Villalobos and Buenrostro Created the COF Investor Disclosure Letter .........9

            (a)    Villalobos Manufactures COF Letter after Buenrostro Forced Out............................................................................................9

            (b)    Forensic Analysis Confirmed Buenrostro's Admission of Guilt..............10

        10.    Apollo Payments to ARVCO...............................................................11

    E.    Buenrostro's Cozy Landing at ARVCO .............................................................12

    F.    Villalobos Routinely Used Conduit Campaign Contributions to Further His Influence .............................................................................................................13

G.    Buenrostro and Villalobos Conspired to Defraud the United States and Obstruct Every Investigation into their Corrupt Relationship ............................................13

GUIDELINES CALCULATIONS ........................................................................................16

SENTENCING RECOMMENDATION ................................................................................16

FINES AND RESTITUTION ................................................................................................18

APPENDIX

EXHIBIT 1:    Judgment as to Defendant Federico Buenrostro, April 7, 2015, *SEC v. ARVCO Capital Research, LLC, et al.,* Case No. 12-CV-00221 MMD, District of Nevada

EXHIBIT 2:    Notice of Death of Defendant Alfred J. R. Villalobos, January 6, 2016, *SEC v. ARVCO Capital Research, LLC, et al.,* Case No. 12-CV-00221 MMD, District of Nevada

EXHIBIT 3:    Final Judgment as to ARVCO Capital Research, LLC, January 11, 2016, *SEC v. ARVCO Capital Research, LLC, et al.,* Case No. 12-CV-00221 MMD, District of Nevada

EXHIBIT 4:    Final Judgment as to ARVCO Financial Ventures, LLC, January 11, 2016, *SEC v. ARVCO Capital Research, LLC, et al.,* Case No. 12-CV-00221 MMD, District of Nevada

EXHIBIT 5:    Joint Status Report, January 21, 2016, *SEC v. ARVCO Capital Research, LLC, et al.,* Case No. 12-CV-00221 MMD, District of Nevada

EXHIBIT 6:    Judgment Against Federico R. Buenrostro, Jr., February 16, 2016, *People v. Villalobos, et al.*, Case No. SC107850, Los Angeles County Superior Court

EXHIBIT 7:    Final Judgment as to ARVCO Capital Research, LLC, April 15, 2016, Case No. SC107850, Los Angeles County Superior Court

The defendant FEDERICO R. BUENROSTRO, JR., aka Fred Buenrostro ("Buenrostro") has pled guilty to Count 1 of the Superseding Information, charging a violation of 18 U.S.C. § 371, Conspiracy to Commit Bribery and Honest Services Fraud and to Defraud the United States.  The defendant's adjusted offense level is 31, his criminal history category is I, and his guidelines range is 60 months, the maximum statutory penalty for this offense.

Based on the United States' Motion for a Downward Departure under U.S.S.G. § 5K1.1 as well as the application of the factors set forth in 18 U.S.C. § 3553(a), the United States recommends that the Court sentence the defendant as follows:  a term of imprisonment of 48 months, to be followed by three years of supervised release that includes the conditions proposed by the probation department, and a special assessment in the amount of $100.  The United States also recommends that, in light of the resolution of the defendant's civil liabilities in parallel actions brought by the Securities and Exchange Commission ("SEC") and the State of California, the Court need not impose any fine or further restitution as part of its criminal sentence in this action.

## SUMMARY

Defendant Fred Buenrostro was the Chief Executive Officer of the California Public Employees Retirement System ("CalPERS") from December 2002 until May 2008.  On the eve of his July 2014 trial, Buenrostro chose to plead guilty and cooperate with the United States' investigation.  Buenrostro admitted to the charged conduct in the original Indictment and provided the details of a corrupt relationship with Alfred J. Villalobos ("Villalobos") dating back to 2004 and continuing even after the Indictment was returned in 2013.  The conspiracy climaxed when Buenrostro signed documents at the request of Villalobos and without the knowledge of CalPERS, after accepting roughly $200,000 in cash bribes from Villalobos only months earlier – netting Villalobos millions in ill-gotten gains. Villalobos used those millions not only to fund his extravagant lifestyle, but also to continue his attempt to extend his corrupt influence over other pension funds in California and across the country by means of illegal campaign contributions.

Buenrostro violated the trust of the people of the State of California when he entered into a decade-long conspiracy of corruption, deception, and deceit.  As CEO, the highest ranking officer with powers and duties directly delegated from the CalPERS Board of Administration (the "Board"),

Buenrostro was responsible for the administration of CalPERS' financial affairs and was entrusted with confidential information relating to CalPERS' ongoing and prospective investment of billions of dollars in assets.  He owed a duty of loyalty to the State of California, and its citizens, free from deceit, self-enrichment, concealment, and conflict between his own personal interests and the interests of the State of California.  He utterly failed to carry out that duty.  He has admitted his guilt and cooperated with the United States in its investigation.  He now stands ready to accept the judgment of this Court for both his breach of the public trust and his efforts to repair it.

**THE CRIMINAL CONDUCT**

**A.    The Conspirators**

       **1.    Buenrostro**

Buenrostro is a longtime resident of Sacramento, California.  Buenrostro retired as a state employee on June 30, 2008.  Presentence Report ("PSR"), ¶10, 74.  On July 1, 2008, Buenrostro began working as a consultant for ARVCO.  PSR, ¶96.

       **2.    Villalobos and his Company**

Villalobos was a resident of Zephyr Cove, Nevada, until his death on January 13, 2015, which first reported to the Court by the United States Attorney's Office on the morning of January 14, 2015, prior to the parties' last scheduled Court appearance set for later that same day.  Following inquiries into the circumstances surrounding the death, the Superseding Indictment was formally dismissed by the Court upon motion of the United States on July 28, 2015.  PSR, ¶5.

Villalobos had served as a deputy mayor of Los Angeles as well as a member of the Board of Directors of CalPERS.  After leaving the board in 1995, Villalobos became a placement agent, lobbying on behalf of investment firms seeking investments from pension funds.  The firm Villalobos founded and ran, eventually known as "ARVCO," specialized in placement agent services.  ARVCO's compensation was typically contingent on the successful solicitation and sale of securities to an investor, typically a public pension fund.  The commission was calculated based on a percentage of the dollar amount committed by the underlying investor.  PSR, ¶13-15.

//

//

**B.    The Victims**

**1.    CalPERS**

CalPERS is a public pension fund established by the State of California in 1932 to provide, among other things, retirement benefits to employees of the state and their beneficiaries.  Among other duties, CalPERS is charged with the fiduciary responsibility to manage and invest the money deducted from the salaries and wages of California's state employees in order to provide the means to fund the defined benefits (i.e., pensions) promised to its beneficiaries.  CalPERS is one of the largest and most significant pension funds in the United States, managing and investing hundreds of billions of dollars in assets for its beneficiaries.  PSR, ¶9.

**2.    Apollo Global Management**

Apollo is one of the largest and most profitable private equity funds in the world.  Apollo was one of ARVCO's major clients and the source of most of its annual revenues between 2006 and 2009.  PSR, ¶ 16.  ARVCO facilitated a series of investments in which CalPERS committed a total of approximately $4.8 billion dollars to a group of funds managed by Apollo, for which the relevant investments were:

- Apollo Management VII, L.P., Apollo Investment Fund VII, L.P., and Apollo Overseas Partners VII, L.P. (collectively known as "Fund VII");
- Apollo Special Opportunities Managed Account, L.P. and Apollo SVF Management, L.P. (collectively known as "SOMA");
- Apollo EPF Management, L.P.,  Apollo EPF Advisors, L.P., and Apollo European Principal Finance Fund (Feeder) (collectively known as "EPF");
- Apollo Europe Management, L.P. and AP Investment Europe Limited, L.P. (collectively known as "AIE"); and,
- Apollo Credit Opportunity Management LLC and Apollo Credit Opportunity Fund I, L.P. (collectively known as "COF").

**C.    The Corrupt Relationship and Resulting Conspiracy**

Buenrostro entered into a conspiracy with Villalobos to enrich one another by abusing Buenrostro's powers and influence as CEO of CalPERS on an unprecedented scale.  Beginning as early as 2004 and continuing during the remainder of his term of office, Buenrostro repeatedly accepted items of value from Villalobos in exchange for the exercise of his powers for the benefit of Villalobos.  PSR, ¶¶ 22, 33-35.  Early in the conspiracy, Villalobos used Buenrostro's mere presence to add luster and gravitas to important meetings with his clients, knowing that Buenrostro would place his interests over

1   his duty to CalPERS.  Buenrostro was present when Villalobos provided valuable casino chips to certain

2   (now former) members of the CalPERS Board before the Board considered a proposal from Health Care

3   Company No. 1 in connection with CalPERS' healthcare benefit program.  In October 2005, Buenrostro

4   was present when two of these (now former) Board members, who sat on the Board's Health Benefits

5   Committee, voted to recommend to the full CalPERS Board that Health Care Company No. 1 take over

6   CalPERS' pharmacy benefits program.  The full Board, including all three of the (now former) Board

7   members who received the casino chips, later voted to adopt the Committee's recommendation and

8   award the pharmacy benefits contract to Health Care Company No. 1.  PSR, ¶ 37.  Buenrostro and

9   Villalobos, having already mutually profited from their corrupt dealings, took the conspiracy to another

10  level after Apollo instituted a new requirement for its placement agents in 2007.

11         **D.    Buenrostro and Villalobos Conspired to Defraud CalPERS and Apollo**

12         In or about March 2007, Apollo's new Chief Legal Officer, John Sudyam, instituted a new

13  protocol under which placement agents, like Villalobos, were required to obtain a written

14  acknowledgment, from the investor, of the relationship between Apollo and the placement agent, before

15  Apollo would pay the agreed-upon placement fee.  At the specific direction of Mr. Sudyam, Apollo's

16  outside counsel made it clear to all placement agents, including ARVCO, that as of March 2007 and

17  forward, no fees would be paid to any agents who assisted in securing an investment in any Apollo fund,

18  unless and until the agent submitted a written disclosure form signed by the investor in compliance with

19  the securities laws.   PSR, ¶16.

20         **1.    Apollo Formally Advised ARVCO of Investor Disclosure Requirement**

21         On August 1, 2007, Akin Gump, outside counsel for Apollo, emailed ARVCO with an exemplar

22  of the investor disclosure form letter to be used in connection with CalPERS' upcoming investment into

23  Fund VII.  The firm expressly advised ARVCO that it needed to obtain execution of the letter from

24  CalPERS in order to comply with the Investment Advisers Act of 1940 ("IAA").  PSR, ¶18.

25         **2.    CalPERS Refused to Execute Letter for Fund VII**

26         On August 23, 2007, Carissa Villalobos, Villalobos' daughter and then ARVCO's General

27  Counsel, forwarded the subject form letters to Joncarlo Mark, the Senior Portfolio Manager for

28  CalPERS' Alternative Investment Management Program ("AIM").  By that time, CalPERS and Apollo

1   had already closed the underlying investment transaction.  That same day, Mr. Mark responded to Ms.

2   Villalobos via e-mail that, based on advice from CalPERS' legal department and outside counsel,

3   CalPERS was declining the request and advised her that he could not sign the letter.  Mr. Mark also

4   advised Ms. Villalobos to contact Marte Castanos, an in-house counsel at CalPERS, if she had any

5   further questions.   Later that same day, Ms. Villalobos contacted Mr. Castanos by phone and asked him

6   about CalPERS' decision to not sign the investor disclosure form.   Mr. Castanos expressly advised Ms.

7   Villalobos that CalPERS' policy was not to sign letters such as this one which did not directly impact or

8   benefit CalPERS, and that no one at CalPERS would be authorized to sign the document.  Neither Mr.

9   Mark nor Mr. Castanos were contacted again about the investor disclosure letter for Fund VII or any

10  other CalPERS investment in Apollo.  PSR, ¶21.

11              **3.      Villalobos Delayed until Buenrostro Signed the Fund VII Letter**

12          Of course, this scheme did not just deceive CalPERS.  Apollo was also strung along for months

13  until the phony letter for Fund VII was finally delivered in early 2008.  Akin Gump repeatedly advised

14  ARVCO about the importance of the agreements to Apollo in complying with the IAA.  On December

15  18, 2007, a senior Akin Gump attorney on the matter sent an e-mail to Ms. Villalobos reminding her that

16  Akin Gump had still not received the Investor Disclosure letters that were necessary before fees would

17  be paid.

18              **4.      The Corruption Deepened When Buenrostro Accepted Cash from Villalobos**

19          Meanwhile, by December 2007, Villalobos had paid, and Buenrostro had accepted, a series of

20  cash bribes totaling $200,000 in exchange for Buenrostro's agreement and willingness to use his

21  position for the benefit of Villalobos and his interests.  Villalobos delivered these cash payments on

22  three occasions at the Hyatt Regency across the street from the Capitol in Sacramento in three

23  installments: the first two payments of $50,000 were each delivered in a paper bag, while the last

24  installment of $100,000 was delivered in a shoebox.   In making the first payment, Villalobos told

25  Buenrostro to avoid depositing the funds in any increments of more than $10,000 in order to avoid the

26  creation of a report by the depositing bank.  Upon delivering the $100,000 in December 2007,

27  Villalobos advised Buenrostro to be sure to "shuffle" the currency, as the bills were new and appeared to

28  be in sequential order, such that a deposit of a large number of sequential bills could also generate a

1  report by the depositing bank.  PSR, ¶¶33, 37.

2      Given Villalobos' warnings about the possibility of detection, Buenrostro decided to store the

3  funds in a safe deposit box he maintained at the time at a local Bank of America branch in downtown

4  Sacramento.   He thereafter removed the currency as needed for payments.  Buenrostro used all or

5  virtually all of the bribes Villalobos paid to him in 2007 to pay the fees and costs of his pending divorce

6  litigation, delivering cash and later cashier's checks to his divorce attorney in Sacramento.  Buenrostro

7  has admitted that could not have afforded to pay his divorce attorney's fees and the divorce settlement

8  on his legitimate income.  Indeed, the FBI's financial analyst has confirmed that Buenrostro's legitimate

9  income is fully accounted for in the periods of 2007-2008, such that he could not have afforded to make

10  any significant payments to the divorce attorney for attorney fees or the divorce trust account, let alone

11  the approximately $200,000 in fees and payments that were in fact received by the attorney between

12  January and December of 2007.

13      Buenrostro also explained that while he had already been regularly disclosing confidential,

14  proprietary CalPERS information to Villalobos as early as 2004, the frequency and degree of his corrupt

15  relationship with Villalobos increased exponentially after he accepted the first of the bribes in early

16  2007.  From then on, and until he resigned/was terminated as CEO in May 2008, Buenrostro had

17  regular, sometimes daily telephone conversations with Villalobos.  Villalobos would regularly call

18  Buenrostro regularly to direct him to influence the actions of the CalPERS staff regarding his clients,

19  including Apollo, Aurora, and Pacific Corporate Group.  Buenrostro did, in turn, seek out senior

20  CalPERS staff, typically in the AIM unit, and pressure them to take action for the benefits of Villalobos'

21  clients.  Indeed, their calls became so frequent that Buenrostro, at Villalobos' suggestion, eventually

22  purchased a second, private mobile phone in order to avoid detection of their call history on

23  Buenrostro's CalPERS-supplied mobile phone.  PSR, ¶38.

24      Soon after receiving $100,000 in a shoebox, Villalobos called upon Buenrostro to take actions

25  that would net millions of dollars for Villalobos but ultimately lead to their downfall.

26      **5.    Villalobos Needed a Signed Form in Order to Be Paid**

27      According to ARVCO employee No. 1, sometime in early January 2008, Villalobos asked him to

28  access the template of Fund VII located on ARVCO's server.  Metadata indicates that this same

1   ARVCO employee did, in fact, access the form disclosure that Ms. Villalobos had circulated to Mr.

2   Mark in August 2007.   ARVCO employee No. 1 stated that, after he printed out the form letter,

3   Villalobos directed him to make a series of edits, including adding a signature block for Buenrostro.

4   Villalobos made hand edits onto the printouts of the disclosure letter.  Eventually, after a series of drafts,

5   Villalobos was satisfied with the document, at which point ARVCO employee No. 1 printed out a final

6   version ready for Buenrostro's signature.  When he arrived to the office, Buenrostro signed the originals

7   of the Fund VII letter and now admits, contrary to his original false, obstructive testimony, that he did

8   not keep any copies for himself or submit one to CalPERS' files.

### 6.   Fund VII Letter, Now Signed by Buenrostro, Is Mailed to Apollo

10      On the evening of January 2, 2008, a FedEx shipping label was created online, using ARVCO's

11  FedEx account billing number but listing the sender as "Fred Buenrostro, CalPERS" with a Sacramento

12  address, for delivery to Akin Gump's offices in New York.   FedEx's records indicate that the package

13  was logged into the FedEx system at its distribution center in South Lake Tahoe, not Sacramento, on

14  January 3, 2008.  Over the next several days, Villalobos repeatedly tried to confirm Akin Gump's

15  receipt of the signed CalPERS disclosure letter.  After Apollo's attorneys confirmed receipt of the Fund

16  VII letter, Apollo's legal department authorized the wiring of millions of dollars in fees to ARVCO.

17  PSR, ¶37.

### 7.   With Apollo Paying, Villalobos Went Back to Buenrostro for More Signatures

20      In early 2008, CalPERS was in the midst of negotiating to invest in three other Apollo funds:

21  AIE, SOMA, and EPF.   Villalobos, who was directing these negotiations for ARVCO, asked ARVCO

22  employee No. 1 to prepare a series of blank investor disclosure letters, containing only the CalPERS

23  logo in the upper right hand corner and, at the bottom, a date line and a signature block with

24  Buenrostro's name and job title.   A few days later, after Akin Gump e-mailed the proposed terms for

25  the disclosure letters, Villalobos instructed this same employee to insert the text on the pages already

26  "pre-signed" by Mr. Buenrostro.  Those completed letters for AIE, SOMA, and EPF (along with a

27  disclosure for CalPERS' non-existent investment into the Apollo Asia fund) were deposited into a

28  FedEx drop box in San Diego (where Mr. Villalobos had traveled on business) and shipped to Apollo's

1    attorneys in New York City.  At that point, having received what purported to be investor disclosure

2    letters approved by CalPERS, Apollo's legal department authorized the release of fees due ARVCO per

3    their agreements.  PSR, ¶35, 37.  Accordingly, Apollo paid ARVCO millions more in placement fees.

4         Buenrostro now readily admits that he signed numerous versions of these Apollo Investor

5    Disclosure letters at the request of Villalobos and without providing any of them to CalPERS.  His

6    confession is confirmed in the forensic analysis of the earlier Fund VII letter and the AIE, SOMA, and

7    EPF letters:

8    - ***The CalPERS' logo.***  According to Heather Huerta, CalPERS' Staff Services
         Manager/CalPERS Design Unit, the letterhead and logo that appeared on the letters are not
9        genuine, since the logo was affixed to the wrong side of the page; was the wrong color; the
         wrong size; and appeared blurry and misshapen, likely created by a color copier or scanner;
10

11   - ***An ARVCO printer.***  The lab analysis determined that the investor disclosure letter had been
         created on a Dell color inkjet printer.  Dell's sales documents record that a Dell color inkjet
12       printer was delivered to ARVCO at its offices in Stateline, Nevada, in late 2007, and paid for
         with an American Express card assigned to ARVCO;

13   - ***CalPERS' files.***  None of these disclosure letters exist in any of CalPERS' investment files.
         Amanda Fisk, the AIM file clerk at the time, provided a detailed summary of the nature of
14       CalPERS' paper and electronic filing system in 2008 as well as the repeated efforts she
         personally made to search for any documents in any AIM investment files relating to
15       "Investor Disclosure" as well as any documents signed by Buenrostro in connection with any
         investments.  She and her staff did not locate a single document.
16

17   - ***Forensic Analysis.***  USPIS forensic examination of the physical indentations and
         impressions left on original paper letters and determined that, notwithstanding the multiple
18       dates contained on the letters, the second batch of letters had in fact all been signed one on
         top of the other, consistent with all eight pages of the second set of letters having been signed
19       at the same time.

20        **8.    ARVCO Was Unable to Get a Disclosure Letter from the UC Regents
                  and Did Not Get Paid**

21        After transmitting the second batch of phony CalPERS disclosure letters, ARVCO tried and

22   failed to get a similar disclosure letter from the UC Regents, in order to qualify ARVCO for payment on

23   that account.  On January 31, 2008, Ms. Villalobos and Akin Gump exchanged e-mails and telephone

24   calls with a senior representative with UC Regents, who declined to execute a similar Investor

25   Disclosure form letter.  ARVCO did not have a corrupt relationship with the University of California as

26   it had with CalPERS through Buenrostro and other then sitting Board members.  Apollo never received

27   an executed disclosure form from ARVCO; ARVCO never received any commission in connection with

28   an investment ARVCO had helped to arrange with the University of California into an Apollo fund, a

1    fee worth an estimated $750,000.

2    **9.    Villalobos and Buenrostro Created the COF Investor Disclosure Letter**

3    After executing the phony letters in January 2008, Buenrostro had continued to provide

4    Villalobos with the same intimate access to CalPERS' operations.  He continued working for the benefit

5    of Villalobos and his clients to influence the CalPERS investment staff and CalPERS Board, as directed

6    by Villalobos. The relationship grew so intimate that Buenrostro actually took to conferring with

7    Villalobos for input into the day-to-day operations of CalPERS itself.  PSR, ¶35.

8    For example, in March 2008, Buenrostro transmitted an email to Villalobos containing excerpts

9    of an email from the Chairman of the CalPERS Board to Buenrostro regarding personnel issues and

10    other internal operations of CalPERS.  Many of those issues were the direct result of actions Buenrostro

11    had taken at the request for Villalobos.  The staff was complaining about what they viewed as

12    unprecedented levels of meddling in investment decisions and other delegated functions by Buenrostro.

13    Buenrostro requested Villalobos' assistance and guidance in responding to the issues raised by the

14    Chairman of CalPERS.  Buenrostro sought Villalobos' advice as part an ultimately futile attempt to stay

15    on as CalPERS CEO – a goal that Villalobos, for obvious reasons, fully shared.

16    Buenrostro, who had been under increasing criticism from the Board and senior staff, was

17    ultimately forced to announce his resignation from CalPERS in early May 2008.  Buenrostro was

18    formally relieved of his duties and legal authority on May 12, 2008.

19    **(a)    Villalobos Manufactures COF Letter after Buenrostro Forced**
20    **Out**

21    The discrepancy between fact and reality is perhaps greatest in the last round of phony letters

22    transmitted to Apollo.  CalPERS' investment in COF was not even contemplated until on or about May

23    10, 2008, and the language in the disclosure letter did not exist until sometime in June 2008.  On May

24    10, 2008, Ms. Villalobos and an in-house attorney at Apollo began exchanging initial drafts for a

25    placement agent agreement regarding a new fund, Apollo Credit Opportunity Fund ("COF").   The

26    potential agreement contemplated that ARVCO would assist Apollo in securing CalPERS' investment

27    into COF.  Apollo had just begun to finalize the structure of that fund and only recently begun the

28    process of offering the funds to potential investors, including CalPERS.  PSR, ¶37.

1    Meanwhile, on June 13, 2008, Mr. Villalobos instructed the ARVCO employee No. 1 as well as

2    ARVCO employee No. 2 to prepare an investor disclosure letter for CalPERS' investment in COF.  He

3    then provided the two of them with one of the blank template letters previously signed by Buenrostro.

4    ARVCO employee No. 1 then mistakenly printed the disclosure terms for the SOMA Fund rather than

5    COF onto the paper that had been "pre-signed" by Buenrostro.     Indeed, metadata from ARVCO shows

6    that he/she accessed and created the SOMA text for the disclosure letter on June 13, 2008. As this letter

7    was undated, ARVCO employee No. 1 handwrote the date "5/20/08"onto the letter, as instructed by

8    Villalobos.  ARVCO employee No. 2 then prepared a cover letter and e-mailed and overnighted the

9    SOMA letter (but represented to Apollo as a COF disclosure) to the in-house attorney at Apollo.  Apollo

10   quickly determined that the letter was wholly unsatisfactory, because it was for the wrong Apollo fund!

11   On June 19, 2008, Apollo sent Ms. Villalobos a revised agreement and disclosure letter that

12   specified that Apollo would pay ARVCO more than $9M in placement agent fees.  After learning that

13   his staff had sent Apollo the wrong disclosure letter, Villalobos called the two ARVCO employees into

14   his office.  In the presence of both, Villalobos then pulled another Buenrostro, "pre-signed" blank

15   template letter from his desk drawer and handed it to the immunized ARVCO employee, instructing

16   them to add the correct COF language to the letter and warning them, "This is my last one.  Don't f**k

17   it up!"

18   The two employees were able locate the correct COF disclosure language and print it onto the

19   (apparently last) blank letter "pre-signed" by Buenrostro.  Once again, the employee handwrote it the

20   date "5/20/08" onto the completed COF disclosure letter.  The correct COF letter, along with the original

21   COF placement Agreement between ARVCO and Apollo, was sent via FedEx on June 19, 2008.

22   Within days of receiving this COF disclosure letter signed by Buenrostro, Apollo's legal department

23   authorized its accounting department to process the COF fees due ARVCO.  Apollo immediately wired

24   ARVCO millions of dollars in COF fees to ARVCO.  PSR, ¶¶35, 37.

25                    **(b)        Forensic Analysis Confirmed Buenrostro's Admission of Guilt**

26   Villalobos was asked about the circumstances surrounding the COF letter and the botched

27   SOMA letter at his November 2012 depositions.  He essentially denied all wrongdoing and placed the

28   blame for any mishandling on his daughter, Carissa, and his assistant, Dustin Fox.  He admitted that

1   ARVCO transmitted two different SOMA letters, one dated "11/20/07" months earlier and the other

2   dated "5/20/08."  As with his answers regarding the prior discrepancies in dates, he claimed that the

3   different dates were requested by Apollo for reasons unknown to him.  Buenrostro, of course, has

4   admitted that the COF letter is the last in the series of concocted disclosure letters he signed at

5   Villalobos' request.

6       The circumstances surrounding this last original disclosure letter are even more troubling than

7   for the two earlier batches.  Testing and analysis of this original document, combined with the extrinsic

8   evidence surrounding the document, reveal the following:

9   - ***CalPERS logo.***  This last original letter shares the same characteristics as the Fund VII letter
      and the subsequent SOMA/AIE/EPF/Asia letters.  The logo on each letter is a forgery,
10     according to Ms. Huerta from CalPERS;

11  - ***Same ARVCO Printer.***  Lab analysis determined that this tenth original letter had been
      printed on an inkjet printer, consistent with the earlier phony letters;
12
13  - ***Time Travel.***  Metadata for both the botched SOMA/COF letter and the subsequent corrected
      COF letter record that both letters were created in or around June 2008, well after Mr.
      Buenrostro had been pushed out as CEO;
14
15  - ***Handwritten Date.***  Even before he confessed to his role in the conspiracy, Buenrostro
      himself had truthfully stated he did not handwrite the date of "5/20/08"onto this COF letter.
      In fact, it was not Buenrostro but the ARVCO employee who had written in the "5/20/08"
16     date on both the botched SOMA/COF letter and the amended/corrected COF letter in June
      2008;
17
18  - ***CalPERS files.***  Ms. Fisk again stated that she could not locate any copy of the COF letter in
      any AIM investment file and that if she been provided a copy in 2008, the letter would have
      required her to consult with AIM management in order to determine how to file the
19     document; and,

20  - ***Forensic Analysis.***  The USPIS lab analysis of this last original letter revealed that, based on
      the impressions left on pages themselves, this letter had been signed at the same time as the
21     second batch of original letters delivered to Akin Gump in January 2008, consistent with all
      of the pages having been signed at the same sitting, at same time, one on top of the other.  In
22     other words, COF was signed at the same time as the eight letters delivered to Akin Gump in
      January 2008 - and could not have been signed in May or June 2008.

23

24          **10.    Apollo Payments to ARVCO**

25      After receiving the last of these phony disclosure letters in June 2008, Apollo began to pay

26  ARVCO the fees due under their contract with ARVCO, eventually paying a total of more than $14

27  million dollars.  Since learning of the fraud, Apollo stopped making any further payments owed to

28  ARVCO under the placement agreement for each investment fund – fees that could have netted

1  Villalobos as much as $35 million over the life of all the contracts.  Apollo has made debtor claims in

2  ARVCO's bankruptcy action, seeking to recover the millions it paid ARVCO under false and fraudulent

3  pretenses between 2008 and 2010.  PSR, ¶37(z).

4  **E.    Buenrostro's Cozy Landing at ARVCO**

5  Buenrostro stayed on the State's payroll through June 30, 2008.  Buenrostro, however, began to

6  appear and work at ARVCO's workplace in June, well before he left the State's payroll.  There is no

7  record currently available that Buenrostro seriously entertained any other offer of employment in the

8  months before his departure, or that he recused himself from any matter at CalPERS while searching for

9  his next job.

10  On or about July 1, 2008, Buenrostro began work as a consultant for ARVCO.  On or about July

11  2, 2008, Mr. Buenrostro deposited a check dated June 30, 2008, in the amount of $25,000 drawn on

12  ARVCO's business account.  The memo line read "July 2008."  Mr. Buenrostro continued to receive

13  regular paychecks/payments from ARVCO approximately once a month through April 30, 2010.  In

14  reality, Buenrostro was rarely at the ARVCO offices and did little work, according to several ARVCO

15  employees.   Between June 30, 2008, and April 30, 2010, ARVCO paid Mr. Buenrostro a (gross) total of

16  $387,500 to do work ostensibly as a consultant for ARVCO.  In addition, Mr. Buenrostro received

17  expense reimbursements, apparently for travel and related expenses, between July 2008 and December

18  2009 totaling approximately $84,000.  PSR, ¶¶22, 33.

19  In September 2008, Buenrostro received a gold Rolex watch from Mr. Villalobos.  The watch

20  was paid for with a check in the amount of $26,846, drawn on ARVCO's business account.   The watch

21  back contained the inscription:

22
**Fred B.**
**To an awesome future**
23  **FF,**
**AJV**
24

25  While working for ARVCO and Villalobos, Buenrostro made a campaign contribution of approximately

26  $2,400 to a candidate for federal office, reimbursed by Villalobos in cash.  This was not the first time

27  Mr. Villalobos had made use of straw donors.  In fact, he had been engaging in the practice for at least

28  five years, coinciding with Villalobos' payment of valuable casino chips to now former members of the

1   CalPERS Board.

2       **F.    Villalobos Routinely Used Conduit Campaign Contributions to Further His**

3               **Influence**

4       Indeed, Buenrostro's admission is consistent with the admission of other former ARVCO

5   employees, who were repeatedly asked to make campaign contributions to candidates for elected office

6   in California, New York, and elsewhere.  As with Buenrostro, Villalobos made the request with the

7   promise that the employees would be fully reimbursed for their contribution.  The use of straw donor

8   contributions is prohibited under federal law at 2 U.S.C § 441f as well as many state and local

9   jurisdictions.

10      These confirmed instances of conduit contributions, sometimes known as "straw donors," were

11   not random but provide a clear road map to the conspiracy's long term goal of extending Villalobos'

12   corrupting influence to other pension funds and those officials charged with investing assets or

13   appointing individuals to a governing board.

14      To be clear, the United States does not suspect that the recipients of these funds were aware of

15   the fraudulent nature of their contributions.  Indeed, in many instances, the candidates and their

16   campaigns required their donors to complete "donor cards" in which donors confirmed that the

17   contribution had not been, and would not be, reimbursed by any other party.  Villalobos repeatedly

18   circumvented those efforts by directing the employees and others to execute false and fraudulent donor

19   cards that he then provided to the campaigns along with the illicit funds.   Ultimately, several campaigns

20   returned the conduit contributions following media reports of the existence of the SEC and California

21   state investigations into Villalobos and ARVCO in 2009 and 2010.

22       **G.    Buenrostro and Villalobos Conspired to Defraud the United States and Obstruct**

23               **Every Investigation into their Corrupt Relationship**

24      Only a few months after arranging yet another round of conduit contributions, Villalobos and

25   Buenrostro were confronted with the SEC's nationwide investigation into "pay to play" activities

26   involving placement agents.  In the wake of New York's state charges against Alan Hevesi, the New

27   York state Comptroller, and media reports of potential problems involving other public pension funds

28   around the country, the SEC opened an investigation into public pension funds, and in particular,

1  investment managers, equity funds, and brokers dealers.  Given the need to quickly assess the depth and

2  breadth of the problem, the SEC issued a series of "Section 21(a)(1) Orders" that constitute the

3  equivalent of written interrogatories.  In response, Buenrostro and Villalobos agreed to embark on a

4  campaign of obstruction that continued even after both were sued by the State in May 2010; sued by the

5  SEC in March 2012; and indicted by a federal grand jury in March 2013.  PSR, ¶24.

6       Specifically, on July 17, 2009, the SEC sent a Section 21(a) inquiry to ARVCO seeking

7  information about, among other things, its role as a placement agent in connection with investments by

8  public pension funds into private equity and other investment vehicles.  On or about August 7, 2009, and

9  again on or about September 25, 2009, ARVCO filed reports with the SEC, notarized and signed under

10  penalty of perjury, in which ARVCO, among other things, represented that it had obtained the Investor

11  Disclosure letters for the Apollo-managed funds from CalPERS when, in fact, both knew they had

12  conspired to corruptly create and then execute these letters back beginning in January 2008.[1]  ARVCO

13  selectively produced documents to the SEC, as directed by Villalobos.  The two men also attempted to

14  cover up the evidence of their corrupt relationship by concealing and destroying records that existed in,

15  among other places, ARVCO's own files. PSR, ¶¶24-26, 36-37.

16       On March 18, 2010, Buenrostro appeared for sworn testimony with the SEC.  He was asked a

17  series of questions under oath by the SEC, which he declined to answer, citing his Fifth Amendment

18  privilege against self-incrimination.  Among other questions posed, the SEC asked specifically about the

19  nature of his relationship with Villalobos as well as the Apollo Investor Disclosure letters.  Soon after,

20  Buenrostro confronted Villalobos, insisting he give him the money to cover the attorney fees to defend

21  against this investigation into their corrupt dealings.  Villalobos told Buenrostro he could not give him

22  the money, given the suspicions it might raise with the SEC.  PSR, ¶27.

23       Instead, on or about April 14, 2010, Villalobos provided Buenrostro with a check for $50,000

24  premised on a purported promissory note between Villalobos and myself.  The memo line on the check

25  read "134 Holly Lane," a property Buenrostro had bought from Villalobos after joining ARVCO.

26

27      [1] The filings were prepared by a law firm that eventually represented Villalobos and ARVCO in

28  litigation before the bankruptcy court in Nevada.  The firm ultimately withdrew as counsel for ARVCO and Villalobos and is now a creditor of the estate in that same bankruptcy action.

1    However, there was no indication in Buenrostro's bank account or the property records for 134 Holly

2    Lane of any activity at the property (such as repairs or change in ownership) to justify the reference to

3    134 Holly Lane.  Villalobos never sought to enforce the note, and it has yet to be enforced even years

4    later in estate bankruptcy proceedings.  It was, in fact, a further bribe of $50,000.  In exchange,

5    Buenrostro gave Villalobos a copy of the transcript of his SEC testimony, providing him with a detailed

6    roadmap to the SEC's investigation and areas of interest.  PSR, ¶28.

7         Thereafter, Villalobos and Buenrostro met and conferred on numerous occasions in order to

8    prepare substantive responses to, among other things, the nature of their relationship and the Apollo

9    Investor Disclosure letters.   Villalobos provided Buenrostro with the answers he was to give when next

10   confronted by a government investigator.  On or about December 27, 2010, Buenrostro was asked a

11   series of questions under oath by the State of California and gave false testimony about the phony

12   Investor Disclosure letters and his relationship with Villalobos.  Villalobos subsequently reviewed the

13   transcript of his testimony and advised Buenrostro that he had responded as they had planned.  PSR,

14   ¶31.

15        In addition, Villalobos used that transcript, and the false tale he had spun out of Buenrostro's

16   lips, to further his goal of obstruction.  On or about November 28, 2011, Villalobos executed a written

17   response to an SEC "Wells" notice in which he, among other things, adopted the same false statements

18   Buenrostro had given during his December 27, 2010, deposition as well as his own role in the creation,

19   execution, and transmittal of the fraudulent Apollo Investor Disclosure letters.  PSR, ¶37.  Villalobos

20   also used that same transcript in an attempt to tamper with and improperly influence the testimony of

21   other witnesses.  On one occasion, Villalobos paid for ARVCO employee No. 4 to fly to Reno, where he

22   met the employee at the airport and showed the employee Buenrostro's transcript in an effort to have yet

23   another witness corroborate the lies Buenrostro had told about the letters and their corrupt relationship.[2]

24        Buenrostro voluntarily appeared for a voluntary interview on February 3, 2012, in San Francisco,

25   with the SEC, the USPIS, the FBI, and United States Attorney's Office ("USAO").  Buenrostro repeated

26   the same answers he had given in his December 2010 deposition, even when he was advised that the

27

28   _____
     [2] ARVCO Employee No. 3 is discussed in the United States' sealed filing in connection with this
     sentencing hearing.

United States had identified metadata and forensic details that contradicted his statements and made parts of his timeline impossible.  PSR, ¶¶32, 37.  After his interview, Buenrostro shared this new information with Villalobos.  Villalobos was able to use that information when he sat for multiple days of false and misleading testimony in depositions in November 2012, only months before the two men were indicted in March 2013.  Villalobos made still more false statements on the material aspects of the investigation when he was deposed as late as November 2013 in his own affirmative litigation against Apollo in Nevada.  PSR, ¶37.

## GUIDELINES CALCULATIONS

The United States agrees with the Probation Officer's Guidelines calculations, which should be calculated as follows:

| | | | |
|---|---|---|---|
| a. | Base Offense Level<br>U.S.S.G. §2C1.1(a)(1): | | +14 |
| b. | Specific offense characteristics<br>More than One Bribe<br>U.S.S.G. § 2C1.1(b)(1): | | +2 |
| | Value of Benefit Received/To Be Received<br>U.S.S.G § 2C1.1(b)(2); U.S.S.G. § 2B1.1(b)(1)(G): | | +12 |
| | High-Level/Sensitive Public Position<br>U.S.S.G. § 2C1.1(b)(3): | | +4 |
| c. | Obstruction of Justice<br>U.S.S.G. § 3C1.1: | | +2 |
| d. | Acceptance of Responsibility:<br>U.S.S.G. § 3E1.1: | | -3 |
| e. | Adjusted Offense Level | | 31 |

At a criminal history category of I, the Guidelines recommend a range of 108 to 135 months of imprisonment.  The maximum sentence for a violation of 18 U.S.C. § 371 is 60 months.

## SENTENCING RECOMMENDATION

Buenrostro pled to the Superseding Information charging him with one count of conspiracy under both prongs of 18 U.S.C. § 371, namely conspiracy to commit an offense against the United States, specifically bribery under 18 U.S.C. § 666 and honest services fraud under 18 U.S.C. §§ 1341, 1343, and 1346, as well as conspiracy to defraud the United States as alleged in the original Indictment.

Based on this and other new information, the United States was able to obtain a Superseding

1   Indictment against Villalobos, charging him with the same dual conspiracy under section 371 that

2   Buenrostro pled to as well as further charges under section 1001(a)(1) and 1349.  Buenrostro would

3   have been one of the central Government witnesses at Villalobos' trial that was set to proceed in

4   February 2015, but he never had the opportunity.  One month before the trial, Villalobos was found dead

5   in an indoor gun range in Reno, Nevada, from a self-inflicted gunshot to the head that authorities

6   determined was a suicide.

7          Since then, Buenrostro has sat for extensive debriefings about his role in the conspiracy with

8   Villalobos including its origins, early goals, long-term objectives, and the details of their futile efforts to

9   obstruct the investigation. In addition to cooperating with the United States' criminal investigation,

10  Buenrostro also cooperated with parallel civil investigations, including with:

11  
12  - **SEC:**  Buenrostro agreed to a stipulated, bifurcated judgment in the SEC's parallel case
      and agreed to accept civil penalties that SEC may request after reviewing the terms of his
      criminal sentence in this case.  He was also prepared to testify in the SEC's civil trial
13    against Villalobos and his company; Villalobos' suicide made that unnecessary.  *See
      SEC v. ARVCO Capital Research, LLC, et al.*, Case No. 12-CV-00221 MMD, District of
      Nevada; *see also* Exhibits 1-5, attached hereto.
14  
15  - **California Attorney General:**  Buenrostro agreed to a stipulated judgment in the State's
      civil complaint in which he agreed to repay a total of $250,000 to the State, including the
16    $200,000 he had received in direct cash bribes from Villalobos, prior to doctoring the
      investment documents and obstructing the investigations.  He also sat for debriefings and
17    further deposition with the Attorney General's office as to the particulars of their civil
      complaint. *See People v. Villalobos, et al.*, Case No. SC 107850, Los Angeles County
      Superior Court; *see also* Exhibits 6-7, attached hereto.

18  
19         Until very recently, Buenrostro had performed very well on pre-trial release, before and after his

20  guilty plea.  However, in late 2015, Buenrostro was involved in a domestic violence incident with a

21  female companion that resulted in a "no contact" order and a restraining order from the state court in

22  Sacramento County.   As detailed in the Presentence Report, neither party suffered any significant

23  injuries.  PSR ¶ 57.  The Sacramento District Attorney did later charge with Buenrostro with a

24  misdemeanor domestic violence charge.  Buenrostro pled *nolo contendere* to the charge in March 2016

25  and was sentenced to 60 days probation.  In late April 2016, Buenrostro was arrested for violating his

26  state probation when he had contact with her in violation of his state probation and his promise to this

27  Court.  As with the earlier incident, no injuries were reported by either party.

28         Buenrostro was arrested, his probation was revoked, and he recently completed a term in

1    Sacramento County jail.  He has now been transferred to the custody of the United States Marshal, as the

2    Court granted Pretrial Service's application for an arrest warrant for his violation of the terms of his

3    bond.  As a result, Buenrostro will appear for his sentencing already in federal custody.

4         While this behavior is troubling, the United States does not believe this conduct should result in

5    Buenrostro's failure to receive a "5K" recommendation.   Buenrostro will spend several months in

6    county jail prior to his designation and transport to a BOP facility as a result of this conduct.  His actions

7    should not, however, nullify his hard work to provide information to the Department of Justice and

8    others while fully embracing the full scope and impact of his own corrupt conduct.

9         Therefore, the United States is recommending that Buenrostro receive a 12 month reduction from

10   his otherwise applicable Guidelines range/statutory maximum of 60 months.  A 48 month sentence is

11   appropriate not only on the merits of his significant and extremely helpful cooperation efforts, but also

12   represents a slightly shorter sentence than was imposed by this Court earlier this year on former

13   California State Senator Leland Yee.  As a further point of comparison, the District Court in Manhattan

14   last week sentenced former New York State Senate leader Dean Skelos to 60 months of imprisonment

15   and a $500,000 fine for his convictions following a contested jury trial last year.  *See United States v.*

16   *Skelos*, *et al.*, CR 15 - 0317 (S.D.N.Y. May 12, 2016)

17                              **FINES AND RESTITUTION**

18        In light of the large civil judgment Buenrostro has already agreed to repay to the State of

19   California, the potential for additional civil penalties in the SEC action, and no other claims having been

20   received, the United States recommends that the Court's mandate for victim restitution, pursuant to 18

21   U.S.C. § 3663A and § 3664, be deemed satisfied.  In light of this large civil judgment, the United

22   States joins with the Probation Office's recommendation that any fine be deemed waived.

23   DATED: May 19, 2016                    Respectfully submitted,

24                                         BRIAN J. STRETCH
                                           United States Attorney
25

26

27                                            /s/
                                           TIMOTHY J. LUCEY
28                                         Assistant United States Attorney